**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **GIFFNEY PERRET, INC.,** | ) | |
| **f/k/a LANYAP, INC.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **No. 07 C 0869** |
| | ) | |
| **SHERRIE MATTHEWS, and** | ) | **Judge Rebecca R. Pallmeyer** |
| **PRINT SOLUTIONS OF INDIANA, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Giffney Perret, Inc., formerly known as Lanyap, Inc., was in the direct mail marketing business until it sold most of its assets in 2007. In this lawsuit, Plaintiff alleges that a former employee, Defendant Sherrie Matthews, violated a restrictive covenant in her employment agreement with Plaintiff when she formed Defendant Print Solutions, Inc., a business in competition with Lanyap. Plaintiff seeks damages against Matthews for breach of contract and tortious interference with business expectancy, against Print Solutions for tortious interference with contract, and against both Defendants for misappropriation of trade secrets.

Defendants have filed a motion for summary judgment on all counts. For the reasons explained below, the motion for summary judgment is granted in part and denied in part. Plaintiff has produced sufficient evidence to create a genuine issue as to whether it had a legitimate business interest in confidential pricing information, which could support its restrictive covenant claim (Count I). Plaintiff has not shown, however, that a sample binder and customer information at issue here constitute protectable confidential information. Nor does Plaintiff produce sufficient evidence to create a genuine issue as to whether it had a legitimate business interest in near-permanent customers. Finally, Plaintiff has failed to produce evidence sufficient to support a finding that Matthews's breach caused Plaintiff to lose the business of former customers Nationwide Insurance or Centier Bank.

Consequently, the only remaining issues in Plaintiff's breach of contract claims are whether

Lanyap's pricing methods constituted confidential information that could support its restrictive covenant against Matthews, and if so, whether Matthews damaged Lanyap by using that confidential information to solicit former customer Anchor Bank's business. Plaintiff has waived its claims of tortious interference with business expectancy, tortious interference with contract, and misappropriation of trade secrets. The court therefore enters judgment in favor of Defendants on Counts II, IV, and V of the Amended Complaint, and dismisses Defendant Print Solutions, Inc. from this action.

## PROCEDURAL HISTORY

This dispute over a restrictive covenant comes before the court on diversity jurisdiction. (Pl.'s Local Rule 56.1(b)(3) Resp. to Defs.' Local Rule 56.1(a)(3) Statement of Material Facts [hereinafter "Pl.'s 56.1"] ¶¶ 4-5.) Plaintiff is currently named Giffney Perret, Inc. but was known at the time of the relevant events as Lanyap, Inc. (*Id.* ¶ 1.) It is an Illinois corporation with its principal place of business located in Lombard, Illinois. (*Id.*) Defendants are Sherrie Matthews, a former employee of Plaintiff, and Print Solutions, Inc., the company that she formed after leaving. (Statement of Material Facts as to Which There Is No Genuine Issue, Pursuant to Local Rule 56.1(a)(3) [hereinafter "Defs.' 56.1"] ¶¶ 2-3.) Both Defendants are citizens of Indiana, with Print Solutions's principal place of business located in Crown Point, Indiana. (*Id.* ¶¶ 3-4.) As a result of Defendants' alleged breach of contract, misappropriation of trade secrets, and tortious interference with contract and business expectancies, Plaintiff alleges actual damages in excess of $400,000 and in addition seeks punitive damages. (Am. Compl. for Breach of Contract and Other Relief [hereinafter "Am. Compl."] ¶¶ 27, 32, 43, 55, Ex. 5 to Bryan Decl.)

As discussed below, the relevant events occurred mid-2005, after Plaintiff fired Matthews and she started a new business competitive with her former employer. (Pl.'s 56.1 ¶¶ 27-33.) In November 2005, Plaintiff filed a complaint in the Circuit Court of DuPage County alleging violation of Matthews's employment contract and seeking both damages and injunctive relief. (*Id.* ¶ 7.) After

some initial discovery and unsuccessful settlement efforts, Plaintiff voluntarily dismissed that action. (*Id.* ¶ 8.)  In February 2007, Plaintiff filed a similar complaint in federal court.  (*Id.* ¶ 9.)  Plaintiff initially sought injunctive relief, but later amended its complaint and now seeks damages only, on a number of theories.  Am. Compl., Ex. 5 to Bryan Decl.)  After discovery, Defendants filed a motion for summary judgment.

## FACTUAL BACKGROUND

### A.     Lanyap's Business

Lanyap, Inc. produced and mailed direct marketing materials for its clients, mainly financial institutions.  (Pl.'s 56.1 ¶ 1.)  The company did not print advertisements itself but rather subcontracted with various vendors to complete any one job.  (Miller Dep. 47, Ex. 3 to Bryan Decl.)  Lanyap had about fifteen customers, (Pl.'s Local Rule 56.1(b)(3)(C) Statement of Additional Facts [hereinafter "Pl.'s Additional"] ¶ 39), of which three are relevant to this lawsuit: Anchor Bank, Nationwide Insurance, and Centier Bank.  (Pl.'s 56.1 ¶¶ 15, 16.)  All three customers employed the services of multiple direct marketing companies.  (Pl.'s 56.1 ¶ 65.)

Anchor Bank in particular plays a central role in the story.  Although Lanyap first acquired Anchor as a client in 2003 (Answer to Interrog. No. 14, Ex. 12 to Harrod Decl.), Plaintiff claims that Lanyap was the only company performing a certain set of jobs for Anchor and that Anchor contracted for that work without requiring Lanyap to bid or otherwise compete for the jobs.  (Pl.'s 56.1 ¶¶ 65-66.)  An Anchor representative, Emily Campbell, testified that the bank typically uses just one company, formerly Lanyap and now Defendant Print Solutions, for its "standard mailing programs" but that Anchor solicits bids for other print projects, such as calendars and holiday advertisements.  (Campbell Dep. 35-36, Ex. 2 to Harrod Decl.)  According to Plaintiff's figures, its gross sales to Anchor totaled $960,633 in 2004 and $509,665 in 2005.  (Answer to Interrog. No. 14, Ex. 12 to Harrod Decl.)

Lanyap had performed print jobs for a second client, Nationwide Insurance, since the late

1990's (Pl.'s Additional ¶ 3), but it generally had to compete in a bidding process in order to win the company's projects. (Shaw Dep. 45, Ex. 4 to Bryan Decl.) Lanyap was often successful in the bidding, however, and by Plaintiff's tally, its gross sales to Nationwide reached $1,357,899 in 2004 and $1,599,156 in 2005. (Pl.'s Additional ¶ 4.)

The final Lanyap client at issue in this case is Centier Bank, "at best" a small customer of Lanyap over the years. (Miller Dep. 61, Ex. 3 to Bryan Decl.) Plaintiff argues that Matthews worked on the Centier account while she was employed at Lanyap, but the testimony Plaintiff cites establishes only that Matthews solicited the bank's business and then worked on a small and unsuccessful test project for Centier. (Pl.'s Additional ¶ 1; Matthews Dep. 43-44, Ex. 5 to Harrod Decl.) Matthews stated that she was not aware of an active business relationship between Lanyap and Centier at the time of her termination, (Pl.'s 56.1 ¶ 26), and a Centier employee likewise testified that the bank was not doing business with Lanyap at the time Matthews left. (Strickland Dep. 26-27, Ex. 11 to Harrod Decl.) Plaintiff has cited no evidence that Centier was an active customer at that time (Pl.'s 56.1 ¶ 26; Pl.'s Additional ¶ 4), but this court notes interrogatory answers in the record in which Lanyap claimed gross sales to Centier in 2004 and 2005 in the amounts of $27,568 and $13,830, respectively. (Answer to Interrog. No. 14, Ex. 12 to Harrod Decl.)

**B.    Sherrie Matthews's Employment at Lanyap**

Defendant Sherrie Matthews began working for Lanyap in August 2002. (Defs.' 56.1 ¶ 19.) Lanyap hired her as a production manager, meaning that she was responsible for assigning work to Lanyap's vendors and ensuring that those suppliers completed their parts of a project in a timely and accurate manner. (*Id.* ¶ 23; Miller Dep. 147, Ex. 3 to Bryan Decl.) An agreement Matthews signed when she began her employment included two restrictive covenants, referred to here as a non-disclosure clause and a non-solicitation clause. (Defs.' 56.1 ¶¶ 20-21.) The non-disclosure provision reads in relevant part:

> I shall not, during the term of my employment and for a period of two (2) years after termination of my employment, disclose any secrets or confidential technology, proprietary information, customer lists, marketing plans or trade secrets of [Lanyap] or [Lanyap] clients, or any matter or thing ascertained by me through my association with [Lanyap], the use or disclosure of which might reasonably be construed to be contrary to the best interest of [Lanyap]. I further agree that should my employment terminate I will neither take nor retain any papers, customer lists, records, files, computer programs and software, other documents or copies thereof, or other confidential information of any kind belonging to [Lanyap].

(Employee Agreement, Ex. 9 to Bryan Decl.) The non-solicitation provision reads:

> I agree that for the period of one (1) year following my leaving of [Lanyap], whether leaving is voluntary or involuntary, that I will not engage or be connected with, in any capacity, any account with which [Lanyap] did business within the year preceding my leaving; or with any company with which [Lanyap] had direct contact as a prospective client.

(*Id.*) The non-solicitation clause also contains a promise not to hire away any employees of Lanyap, but that portion of the agreement is not at issue here.

Through her work as a production manager, Matthews became Lanyap's primary contact with Anchor Bank and Nationwide Insurance. (Pl.'s 56.1 ¶ 25.) According to Plaintiff, Lanyap President James Miller and Vice President Steve Shaw eventually decided to terminate Matthews because of complaints about Matthews's manner of interaction with employees and vendors. (*Id.* ¶ 27; Miller Dep. 95–96, Ex. 3 to Bryan Decl.) On April 21, 2005, Plaintiff fired Matthews. (Pl.'s 56.1 ¶ 27.)

## C.    Matthews's Competition with Lanyap

Whatever her manner with coworkers, Matthews apparently maintained her relationships with clients. Neither side disputes that after her termination, Matthews contacted both Anchor and Nationwide to tell them that she had been fired and to let them know who they could contact at Lanyap in her stead. (*Id.* ¶ 28.) A Nationwide representative testified that Matthews also mentioned her plan to start her own firm but did not at that time solicit Nationwide's business. (Sturgill Dep. 24, Ex. 10 to Harrod Decl.) Within a couple weeks of her firing, Matthews was in contact with Anchor about performing print services for the bank through Matthews's new company,

Print Solutions.[1]  (Pl.'s 56.1 ¶¶ 29-30.)  She was able to set up her new business quickly in part because she had no need to buy equipment, apparently because she planned to utilize vendors as she had at Lanyap.[2]  (Matthews Dep. 217, Ex. 10 to Bryan Dep.)  Matthews submitted a quote to Anchor for jobs that Lanyap had been performing.  (Pl.'s 56.1 ¶ 29.)  The quote contained a "Competitor Pricing" comparison column that illustrated how Anchor might save money by doing business with Print Solutions, which offered prices fifteen percent less than "Competitor Pricing."[3] (Id. ¶ 62; Print Solutions Proposal #2, Ex. 9 to Harrod Decl.)  Shortly thereafter, Anchor awarded to Print Solutions the work that Lanyap had been performing, and by May 15, Print Solutions was billing Anchor.  (Pl.'s 56.1 ¶ 30; Pl.'s Additional ¶ 28.)  An Anchor representative testified that his company made the switch because of poor service from Lanyap, in particular a drop in quality that occurred after Matthews left (a puzzling assertion in light of the fact that Matthew's employment with Lanyap ended just three weeks before she began billing Anchor).  He also acknowledged, however, that Matthews's familiarity with Anchor's business was a factor in the bank's decision to move its business from Lanyap to Print Solutions.  (Pl.'s 56.1 ¶¶ 36-37; Schell Dep. 84, 92, Ex. 4 to Harrod Decl.)  Around the same time, Matthews stopped by the offices of Centier Bank and shortly thereafter received an offer from a Centier employee, Wes Strickland, to print notepads for Centier. (Pl.'s 56.1 ¶ 32; Matthews Dep. 161-62, 164-65, Ex. 10 to Bryan Decl.)  According to Strickland,

---

[1]  Although the parties hotly contest whether Matthews contacted Lanyap's clients or vice versa (Pl.'s 56.1 ¶¶ 29, 31, 32, 34), the dispute is not material; Matthews's employment agreement prohibited that she "engage or be connected with" Lanyap clients, regardless of who contacted whom first. (Employee Agreement.)

[2]  Although the parties hotly contest whether Matthews contacted Lanyap's clients or vice versa (Pl.'s 56.1 ¶ 29, 31, 32, 34), the dispute is not material; Matthews's employment agreement prohibited that she "engage or be connected with" Lanyap clients, regardless of who contacted whom first. (Employee Agreement.)

[3]  The quoted savings were as follows: $1,174.40 per 400,000 "Database Forms"; $1,852.04 per 400,000 "Database Envelopes"; $413.38 per 100,000 "Database BRE's"; $1,102.94 per 72,000 "Surveys – A, D & E"; $463.01 per 100,000 "Survey Envelopes"; and $413.38 per 100,000 "Survey BRE's."  (Print Solutions Proposal #2, Ex. 9 to Harrod Decl.)  Neither party offers any further detail about the print jobs that Lanyap had been performing and that Print Solutions now performs for Anchor.

Centier generally used local printing companies, as opposed to its direct marketing vendors, for this sort of stationary jobs. (Strickland Dep. 29-30, Ex. 11 to Harrod Decl.)

Several months later, Matthews also began performing services for Nationwide, this time as the result of winning a bid. (Pl.'s 56.1 ¶ 31; Sturgill Dep. 32-33, Ex. 12 to Bryan Decl.) Nationwide's representative testified that Nationwide, like Anchor, noticed a decline in quality of Lanyap's service after Matthews's termination. (Pl.'s 56.1 ¶ 36, 38.) Plaintiff does not dispute that these problems led Nationwide to cease doing business with Lanyap months before Nationwide placed any orders with Matthews and Print Solutions. (*Id.* ¶ 39.) Plaintiff argues that Lanyap and Print Solutions bid on "some of the same projects" for Nationwide (Pl.'s Additional ¶ 37), but the cited deposition testimony (of a Nationwide representative) refers to only one project, from which Nationwide "pulled" Lanyap and which Defendants subsequently won on a "rebid" after Nationwide solicited a fresh set of bids.[4] (Govekar Dep. 31-32, Ex. 13 to Harrod Decl.)

Thereafter, Matthews and Print Solutions continued to furnish Anchor, Nationwide, and Centier with services competitive to those of Lanyap. (Pl.'s 56.1 ¶ 33.) Lanyap apparently did not fare well after Matthews left, and in March 2007, Lanyap sold almost all of its assets, including the name "Lanyap," to another company, merely retaining its claims against Matthews. (*Id.* ¶¶ 10-11.)

## D.    Confidential Information

Beyond simply soliciting Lanyap clients, Plaintiff argues that Matthews absconded with confidential information that she used to help her woo away those clients. In response, Matthews both denies that she retained any of Lanyap's property and disputes the confidential nature of the information. (Defs.' 56.1 ¶¶ 40-63.) The iinformation at issue falls into three categories: a binder

---

[4]        Whether Print Solutions also participated in the original bidding is not clear from the record; the Nationwide employee, Lori Govekar, merely stated that both Lanyap and Print Solutions "had quoted on [the] project." (Govekar Dep. 32.) Plaintiff also cites an e-mail exchange about project details between Matthews and Govekar, but the e-mails are dated 2006, after Print Solutions had won the rebid, and they make no mention of the bidding process or of Lanyap. (Ex. 14 to Harrod Decl.)

of sample materials, information about Lanyap's customers and vendors, and information about Lanyap's pricing techniques.

First, both sides agree that Matthews retained a "sample binder" for four days after her termination, but that she returned the binder when Lanyap asked her to do so. (Pl.'s 56.1 ¶¶ 42-43.) While employed at Lanyap, Matthews had assembled the binder herself by collecting sample advertisements, in order to give customers ideas about the sorts of advertisements they might order. (*Id.* ¶ 44.) Lanyap did not create the samples but rather received them from its vendors. (Miller Dep. 147-48, Ex. 3 to Bryan Decl.) There is no evidence that Lanyap gave Matthews any instructions regarding these materials, nor that it had other protocols for keeping the information in the binder confidential. (Pl.'s 56.1 ¶¶ 42-44.)

Second, Plaintiff argues that Matthews took confidential information about Lanyap's clients and vendors. Steven Shaw, Plaintiff's Vice President, testified that after Matthews won Anchor's business, Matthews accidentally forwarded to Lanyap an e-mail containing a job report that showed the status of several jobs Lanyap had been performing for Anchor. (Shaw Dep. 161-62, Ex. 1 to Harrod Decl.) Neither the e-mail nor the job report are in the record,[5] however, and Shaw admitted that Anchor would have had a copy of the report that it could have given to Matthews, or presumably to any other printing business. (Shaw Dep. 162, Ex. 1 to Harrod Decl.) Nor has Plaintiff offered evidence that the report would have been useful to someone who wished to solicit Anchor's business. Apart from Shaw's testimony about this status report, Plaintiff has presented no evidence that Matthews took or retained any documents relating to a information, instead arguing that Matthews took with her "intimate knowledge" of Lanyap's customer accounts that she gained through her work experience at Lanyap. (Pl.'s 56.1 ¶ 46.)

For their part, Defendants note that all three of the customers at issue did business with multiple direct marketing companies. (*Id.* ¶¶ 64-65.) And, as Lanyap's Vice President Shaw

---

[5]     Plaintiff's only evidence about this report seems to be a brief mention by Vice President Shaw in his deposition. (Pl.'s 56.1 ¶ 46; Shaw Dep. 161-62, Ex. 1 to Harrod Decl.)

admitted, the phone numbers for Lanyap's customer contacts were published and would have been easy for Matthews to look up.[6] (Shaw Dep. 147, Ex. 4 to Bryan Decl.) He also admitted that Matthews's prior experience in the printing industry would likely have brought her into contact with the same vendors that Lanyap employed. (*Id.* at 147-48.) Plaintiff points out that there is no evidence that its customers' phone numbers were listed in the phone book, but has not cited any evidence that information about its customers was difficult or costly to obtain. (Pl.'s 56.1 ¶ 48.)

Finally, Plaintiff claims that Matthews took with her confidential information about Lanyap's pricing methods, including knowledge of Lanyap's pricing procedures and markup rates. (*Id.* ¶ 55.) Plaintiff's President James Miller testified that Matthews told him that she had copied a software program that Lanyap used to price its product, claiming she needed it to work from home. (*Id.* ¶ 45; Miller Dep. 121, Ex. 3 to Harrod Decl.) This program was not available commercially but rather was a piece of software that Lanyap's founders claim to have developed based on their experience in the direct marketing industry. (*Id.* at 192-94.) As additional evidence that Matthews misappropriated pricing information, Plaintiff notes that when Matthews solicited Anchor's business, she presented Anchor with a quote that included a "Competitor Pricing" figure. (Pl.'s 56.1 ¶ 53; Print Solutions Proposal #2, Ex. 9 to Harrod Decl.) Matthews had been working on Lanyap's Anchor account immediately prior to her termination, and the job she quoted was one that Lanyap had been performing for Anchor. (Pl.'s 56.1 ¶¶ 53, 56.) Plaintiff insists that the "Competitor Pricing" figures represented Lanyap's pricing scheme, but the only evidence it cites is Miller's testimony that

---

[6]     The cited deposition testimony does not specify where such information is published. The relevant exchange proceeded:

Q:     . . . . [Matthews] knew the names of the people at Anchor, Centier and Nationwide that she talked to, did she not?
A:     She knew their names?
Q     She knew their names?
A:     Sure.
Q:     Their numbers are published. If she didn't remember them, she could pretty much find them without too much difficulty?
A:     Absolutely.

(Shaw Dep. 147, Ex. 4 to Bryan Decl.)

Miller did not "know that the pricing specifically is ours," but that such a conclusion "seems obvious." (Pl.'s Resp. to Defs.' Mot. for Summ. J. [hereinafter "Pl.'s Resp."] 5; Pl.'s 56.1 ¶ 62; Miller Dep. 200, Ex. 3 to Harrod Decl.) Matthews denies that she copied Lanyap's pricing software or Lanyap's "markups" when formulating Print Solutions' quotes. (Defs.' 56.1 ¶ 57.) Matthews testified that she came to the "Competitor Pricing" figures on the Anchor quote by applying an industry-standard 30 percent markup.[7] (*Id.* ¶ 62.)

Finally, Plaintiff highlights certain steps that it took to protect its information: its comprehensive client list was accessible only to the company's president, vice president, and the vice president's wife; Lanyap's premises were locked at all hours and accessible only with a key card; the price estimating program was available only to those employees who needed to price projects as part of their work; and Lanyap required nearly all of its employees to sign employee agreements similar to Matthews's. (Pl.'s 56.1 ¶ 49.) As for Lanyap's actual prices on specific jobs, the company kept a binder of pricing records for each project. (Miller Dep. 190, Ex. 3 to Bryan Decl.) While a project was ongoing, the employee working on the project could simply keep the accompanying binder at her his or her desk. (*Id.* at 190-91.) Once the job was finished, someone at Lanyap placed the binder in locked storage in its basement. (*Id.* at 190.)

## DISCUSSION

### A.     Summary Judgment Standard

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v.*

---

[7]     All of Print Solutions's quoted prices come to eighty-five percent of the "Competitor Pricing" figures (Print Solutions Proposal #2, Ex. 9 to Harrod Decl.), but this does not resolve the dispute. It could be that the "Competitor Pricing" represents a flat thirty percent markup and the Print Solutions prices a ten-and-a-half percent markup (85% of 130% is 110.5%) Equally possible, however, is that Matthews calculated Lanyap's prices using confidential information and then undercut all of those prices by fifteen percent.

*Catrett*, 477 U.S. 317, 322-23 (1986). In determining whether a genuine issue of material fact exists, the court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar, Inc.*, 275 F.3d 654, 658 (7th Cir. 2001). At the same time, a party opposing summary judgment must present evidence on which the jury could reasonably find for the non-moving party. *Rozskowiak v. Village of Arlington Hts.*, 415 F.3d 608, 612 (7th Cir. 2005), citing *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 252 (1986).

## B.     Enforceability of the Covenant

At the center of this case is Lanyap's claim that Matthews has violated the restrictive covenant in her employment agreement with Lanyap. Matthews does not dispute that she breached the covenant when she began competing with her former employer; rather, Defendants argue that Lanyap's covenant was unenforceable. In Illinois, the enforceability of a restrictive covenant is a question of law. *Lawrence & Allen, Inc. v. Cambridge Human Resource Group, Inc.*, 292 Ill. App. 3d 131, 137, 85 N.E.2d 434, 440 (2d Dist. 1997). At the threshold, a restrictive covenant must be ancillary to either a valid contract or a valid employment relationship. *Id.* at 137–38, 85 N.E.2d at 440-41. Illinois law recognizes at-will employment as valid consideration for such covenants, as long as the employment continues for a "substantial period of time." *Id.* (holding that consideration existed where the plaintiff employed the defendant for about two years). Matthews worked for Lanyap for almost three years, and Defendants do not dispute that valid consideration existed.

The inquiry does not end there, however. Illinois law carefully scrutinizes restrictive covenants, because it regards them as restraints on trade. *Lifetec, Inc. v. Edwards*, 377 Ill. App. 3d 260, 268, 880 N.E.2d 188, 195 (4th Dist. 2007). As a result, the enforceability of a restrictive covenant depends upon (1) whether the employer has some legitimate business interest to guard and (2) whether the terms of the covenant are reasonable and necessary to guard that interest. *Lifetec*, 377 Ill. App. 3d at 269, 880 N.E.2d at 195.

### 1.    Legitimate Business Interest

In Illinois, two types of legitimate (or "protectable") business interests can support the enforcement of a restrictive covenant in an employment agreement. A legitimate business interest exists (1) where former employees acquired confidential information through employment and subsequently attempted to use it for their own benefit; or (2) where the employer has near-permanent customer relationships and where, but for their employment, former employees would not have had contact with the customers in question.[8] *Office Mates 5, North Shore, Inc. v. Hazen*, 234 Ill. App. 3d 557, 561, 569, 599 N.E.2d 1072, 1075, 1080 (1st Dist.1992) (examining a restrictive covenant that contained non-solicitation, non-competition, and non-disclosure clauses). The legitimate business interest requirement applies not only to covenants not to compete but also to restrictive covenants with specific activity restrictions such non-solicitation or non-disclosure clauses. *See, e.g.*, *Curtis 1000, Inc. v. Suess*, 24 F.3d 941, 943, 947 (7th Cir. 1994) (examining a covenant not to solicit "customers whom [the employee] had solicited on [the employer's] behalf within two years before he left and to whom [the employer] had made at least one sale during that period").

### a.    Confidential Information

The general rule is that companies have a legitimate business interest in "confidential

---

[8]    The Illinois Supreme Court has never explicitly addressed legitimate business interests as a requirement for the enforcement of restrictive covenants. *See Lifetec*, 377 Ill. App. 3d at 275-79, 880 N.E.2d at 201 (Steigmann, J., concurring). In the court's most recent restrictive covenant case, it upheld a covenant not to compete against two cardiologists, without addressing the issue one way or the other. *See Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 75-79, 866 N.E.2d 85, 98-100 (2006). Nevertheless, Illinois appellate courts have uniformly recognized legitimate business interests as a requirement for enforcing restrictive covenants, *Lifetec*, 377 Ill. App. 3d at 275-76, 880 N.E.2d at 200-01 *and cases cited therein*, as has the Seventh Circuit. *See Outsource Intern.*, 192 F.3d at 666. Until the Illinois Supreme Court addresses the issue, this court is bound by the Seventh Circuit's interpretation of Illinois law as requiring a legitimate business interest as a prerequisite to enforcing a restrictive covenant. *See Advent Electronics, Inc. v. Buckman*, 112 F.3d 267, 274-75 (7th Cir. 1997) (vacating the district court's issuance of a preliminary injunction and remanding for consideration of whether a protectable business interest existed).

particularized information disclosed to [the employee] during the time the employer-employee relationship existed which are unknown to others in the industry and which give the employer advantage over his competitors." *Lifetec*, 377 Ill. App. 3d at 270, 880 N.E.2d at 196 (quoting *Burt Dickens & Co. v. Bodi*, 144 Ill. App. 3d 875, 879, 494 N.E.2d 817, 819 (1st Dist. 1986)). Confidential information need not rise to the level of a trade secret in order for it to support a restrictive covenant. *Tower Oil & Tech. Co. v. Buckley*, 99 Ill. App. 3d 637, 644, 425 N.E.2d 1060, 1066 (1st Dist. 1981). As noted above, Plaintiff's allegedly confidential information falls into three categories: a sample binder; information about customers; and information about pricing, including a piece of pricing software. Each is discussed in turn below.

### i. The Sample Binder

First, Plaintiff claims confidential information in a binder full of sample advertisements from Lanyap vendors, which Matthews compiled and showed to Lanyap customers. Plaintiff cites no authority, however, to support its argument that the sample binder qualifies as confidential information. (Pl.'s Resp. 8.) Under Illinois law, information cannot qualify as confidential if it is "readily available to competitors through normal competitive means." *Office Mates 5*, 234 Ill. App. 3d at 575-76, 599 N.E.2d at 1084-85. In *Office Mates 5*, the plaintiff staffing agency attempted to claim as confidential material such as contact information and other basic facts about its clients.[9] *Id.* The court held that these files did not rise to the level of confidential information, reasoning that all of the data at issue could be obtained simply by referring to a business directory or by "cold calling" the relevant companies. *Id.*; *but cf. The Agency, Inc. v. Grove*, 362 Ill. App. 3d 206, 216-17, 839 N.E.2d 606, 615-16 (2d Dist. 2005) (holding that a staffing agency's client files were confidential information where the files included data on the clients' business cycles, personnel

---

[9] The court listed the plaintiff's customer files as containing the following information: "the client's name, address and key contact person; the client's benefit package; type of word-processing equipment used; its products and services; number of employees; fee the client is willing to pay for placement; and history of placements." *Office Mates 5*, 234 Ill. App. 3d at 575, 599 N.E.2d at 1084.

preferences, and expiration dates of current contracts with the agency).

Under these standards, Lanyap's sample binder does not qualify as confidential, as it merely contained direct mail advertisements that had been mass-mailed to uncounted thousands of people. (Pl.'s 56.1 ¶ 44.) That Matthews collected this widely-distributed material into a binder did not transform it into confidential information. *Cf. Office Mates 5*, 234 Ill. App. 3d at 575-76, 599 N.E.2d at 1084-85. Furthermore, even assuming that Matthews's work at collecting the samples had transformed the binder into something more valuable than an assortment of advertisements, Plaintiff produces no evidence to show that Lanyap took reasonable steps to keep the information "unknown to others in the industry." *Lifetec*, 377 Ill. App. 3d at 270, 880 N.E.2d at 196. Indeed, Plaintiff points to no evidence that Matthews received any instructions on keeping the information in the binder confidential or that Plaintiff had any protocols to protect the information. (Pl.'s 56.1 ¶¶ 42-44.)

### ii.    Customer Information

Next, Plaintiff argues that Matthews took with her confidential information about Lanyap's clients. Under Illinois law, "customer information will constitute confidential information *only* when the information has been developed by the employer over a number of years at great expense and kept under tight security."[10] *Springfield Rare Coin Galleries, Inc. v. Mileham*, 250 Ill. App. 3d 922, 930, 620 N.E.2d 479, 485 (4th Dist.1993) (emphasis in original). As noted above, information cannot qualify as confidential if it "is readily available to competitors through normal competitive means." *Office Mates 5*, 234 Ill. App. 3d at 575-76, 599 N.E.2d at 1085. Plaintiff does not argue

---

[10]    Plaintiff also cites two cases in which Illinois courts used arguably non-confidential customer information to justify enforcing a restrictive covenant, but these cases predate Illinois's adoption of a legitimate business interest requirement. *Compare Wessel Co. v. Busa*, 28 Ill. App. 3d 686, 690, 329 N.E.2d 414, 417 (1st Dist. 1975) (decided April 23); *Smithereen Co. v. Renfroe*, 325 Ill. App. 229, 243, 59 N.E.2d 545, 550 (1st Dist. 1945) *with Nationwide Advertising Service, Inc. v. Kolar*, 28 Ill. App. 3d 671, 673, 329 N.E.2d 300, 301-02 (1st Dist. 1975) (decided May 1, and cited as the first appearance of the legitimate business interest requirement in Illinois law by *Lifetec*, 377 Ill. App. 3d at 276, 880 N.E.2d at 201 (Steigmann, J., concurring))

that the identities of its clients were confidential, but it does claim that Matthews's "intimate knowledge" of its clients' businesses and requirements amounted to confidential information.[11] In cases where an employer shows that its customers' requirements were confidential information, the successful plaintiff can generally point to some particular confidential information beyond mere familiarity with clients. *See, e.g.*, *Tower Oil*, 99 Ill. App. 3d at 643, 425 N.E.2d at 1066 (highlighting the defendant's knowledge of which specific combinations and methods of application of industrial lubricant worked best in servicing clients' machinery).

Plaintiff has produced evidence that Matthews possessed a job report containing information about projects Lanyap had been performing for Anchor (Pl.'s 56.1 ¶ 46), but no evidence that Plaintiff developed the information "over a number of years at great expense" or that it "kept [the information] under tight security." *Springfield Rare Coin*, 250 Ill. App. 3d at 930, 620 N.E.2d at 485. Indeed, Lanyap's Vice President Steven Shaw admitted that his company gave Anchor a copy of the report, and did not suggest that Plaintiff made any effort to prevent Anchor from releasing any of the information in such reports. (Shaw Dep. 162, Ex. 1 to Harrod Dep.) Nor does Plaintiff offer evidence that the information in the report gave Lanyap any particular "advantage over [its] competitors." *Lifetec*, 377 Ill. App. 3d at 270, 880 N.E.2d at 196. As a result, even assuming that Matthews took the report rather than receiving a copy from Anchor, the status report fails to qualify as confidential information.

Aside from this job report, Plaintiff provides no evidence to show that Matthews's "intimate knowledge" of customers consisted of anything beyond the ordinary familiarity that comes from working with a client. (Pl.'s 56.1 ¶ 46.) Such generalized allegations fall short of the "confidential

---

[11]     This opinion addresses pricing information separately from customer requirements and other information about customers. *See Springfield Rare Coin*, 250 Ill. App. 3d at 934, 620 N.E.2d at 487-88 (distinguishing customer information from information about employer pricing policies). An employer's bidding or pricing procedure may remain confidential even while its customers' requirements do not, for instance in cases where customer requirements are released in a public bidding process but where the employer has a confidential method for creating its bids.

particularized information disclosed to [the employee]" that Illinois requires for a showing of confidential information. *Lifetec*, 377 Ill. App. 3d at 270, 880 N.E.2d at 196. The court concludes Plaintiff has failed to provide a "factual basis that would arguably entitle it to judgment in its favor" concerning its assertion that Matthews's knowledge of Lanyap's customers constituted confidential information. *Lawrence & Allen*, 292 Ill. App. 3d at 135, 85 N.E.2d at 439.

### iii.    Pricing Information

Plaintiff also argues that it had a protectable business interest in confidential information about its pricing. Here, Plaintiff is on more solid ground. Illinois courts have held that pricing information can qualify as confidential where the employer attempts to keep it secret and competitors could use the information to undercut the employer. *See Lifetec*, 377 Ill. App. 3d at 270-71, 880 N.E.2d at 196-97. In *Lifetec*, for example, the court held that the quotes of a medical supply company, as well as that company's method for producing quotes, constituted confidential information. *Id.*; *see also The Agency, Inc.*, 362 Ill. App. 3d at 217, 839 N.E.2d at 616 (holding that the markups of a staffing agency qualified as confidential information). Even in circumstances where the employer's customers would be willing to disclose the employer's prices, the employer can nevertheless establish that it has a legitimate business interest if it has a confidential process for calculating prices. *See Donald McElroy, Inc. v. Delaney*, 72 Ill. App. 3d 285, 289, 293, 389 N.E.2d 1300, 1304-05, 1307 (1st Dist. 1979) (holding that the bidding procedure of a silver recovery company constituted confidential information, where bids were calculated using yield figures based on the company's unique machinery). In contrast, pricing methodology does not constitute confidential information where competitors use essentially the same pricing method or where the method is simply a statement of desired profit. *See Springfield Rare Coin*, 250 Ill. App. 3d at 933-35, 620 N.E.2d at 487-88 (holding that a coin dealer's pricing method was not confidential, where the prices merely reflected a desired margin of profit against a published market value).

Plaintiff Lanyap has produced evidence that it had a protectable business interest in

confidential pricing information. Defendants dispute the actual complexity of the pricing method, but this is a disputed issue; Plaintiff's President Miller testified that Lanyap calculated prices using a piece of software that he and Vice President Shaw developed themselves, based on their knowledge of the direct marketing industry. (*Compare* Matthews Dep. 10-14, Ex. 10 to Bryan Decl. *with* Miller Dep. 191-94.) Pricing software that utilizes some information or theory beyond what competitors already had at their fingertips could, like the bidding process in *Donald McElroy*, qualify as confidential information. *See* 72 Ill. App. 3d at 293, 389 N.E.2d at 1307. Furthermore, even if the software was not especially complex, Plaintiff's markups could qualify as confidential information if its markup rates differed in some material respect from standard industry rates and if knowledge of those markups helped Print Solutions to compete with Lanyap. *Cf. Lifetec*, 377 Ill. App. 3d at 270-71, 880 N.E.2d at 196-97. If Plaintiff can show at trial that its pricing markups or method differed materially from commonly-known industry standards, such that the information gave Lanyap an "advantage over [its] competitors," then the information may qualify as a legitimate business interest. *Id.* at 196.

Defendants argue that, regardless of the nature of Lanyap's pricing information, the company did not take sufficient steps to protect the information. (Defs.' Mem. 5.) Under Illinois law, as long as the employer took reasonable steps to guard its information "from the public eye," the measures will generally suffice to preserve the information's status as confidential. *The Agency, Inc.*, 362 Ill. App. 3d at 218-19, 839 N.E.2d at 617 (citing *Lyle R. Jager Agency, Inc. v. Steward*, 253 Ill. App. 3d 631, 640, 625 N.E.2d 397, 402 (3d Dist. 1993)). The customer files at issue in *Lyle R. Jager Agency* remained confidential, where the files were open to employees but not to the outside world. 253 Ill. App. 3d at 639-40, 625 N.E.2d at 402; *see also The Agency, Inc.*, 362 Ill. App. 3d at 218-19, 839 N.E.2d at 617 (holding that a staffing agency had taken sufficient steps to guard its confidential customer information, by limiting access to electronic data to a small group of employees and requiring other employees to receive permission before accessing hard copy files).

Lanyap's price estimating program was available only to those employees who needed to price projects as part of their work, and the company required nearly all of its employees to sign confidentiality agreements. (Pl.'s 56.1 ¶ 49.) Furthermore, although employees such as Matthews had free access to a project's pricing information while working on the project, Lanyap kept its past pricing records under lock and key. (Miller Dep. 190, Ex. 3 to Harrod Decl.) Perhaps the security arrangements could have been stricter, but "it would be impractical to expect a business to work with locked file cabinets." *The Agency, Inc.*, 362 Ill. App. 3d at 219, 839 N.E.2d at 617 (citation omitted). Viewing the evidence in the light most favorable to Plaintiff, Lanyap's pricing information qualified as confidential.

To survive summary judgment on its claim of misuse of confidential information, Plaintiff must produce evidence not only that it had confidential information but also that Matthews took the information and attempted to use it for her own benefit. *See Outsource Intern., Inc. v. Barton*, 192 F.3d 662, 666 (7th Cir. 1999). In this case, that meant offering evidence that Matthews used Lanyap's pricing program or her knowledge of Lanyap's markups to attract customers for Print Solutions. Plaintiff offered evidence that Matthews had knowledge of its markups, and even more importantly, that she had a copy of Lanyap's pricing program on her personal computer.[12] (Pl.'s 56.1 ¶ 46; Miller Dep. 121: 9-13, Ex. 3 to Harrod Decl.) Moreover, the parties agree that almost immediately after her termination, Matthews won business from clients with whom she had worked while at Lanyap. Of particular interest in this regard was a "customer price" comparison that Matthews included in a quote for Anchor Bank. (Pl.'s 56.1 ¶ 53.) Curiously, Plaintiff offers no direct evidence that these "Competitor Pricing" figures matched or were similar to Lanyap's actual prices, but does offer circumstantial evidence: Matthews had worked on Lanyap's Anchor account; she knew Lanyap's pricing scheme on the Anchor account; and after she was fired, she solicited Anchor

---

[12]     The evidence that Matthews took a copy of the pricing program came from Lanyap President Miller, who testified that Matthews told him she had taken a copy, a statement that qualifies as an admission by a party-opponent. *See* FED. R. EVID. 801(d)(2).

for the work Lanyap was doing, advertising savings below "Competitor Pricing." (*Id.* ¶¶ 56, 60-61.) Matthews's testimony that she never used Lanyap's markups or pricing program creates an issue of fact for trial.

To sum up, Plaintiff's sample binder and customer information fail to qualify as confidential. Plaintiff does, however, raise a triable issue as to whether its pricing information constituted confidential information and, if so, whether Matthews misappropriated that information.

### b.  Near-Permanent Customers

Aside from confidential information, near-permanent customer relationships are the other type of legitimate business interest that could support enforcement of Lanyap's restrictive covenant. *See Office Mates 5*, 234 Ill. App. 3d at 569, 599 N.E.2d at 1080.  In order to establish this kind of protectable interest, Plaintiff must show not only that Lanyap had near-permanent customer relationships, but also that, but for her employment, Matthews would not have had contact with those customers.  *See id.*  Illinois courts actually employ two different tests to determine whether an employer has a legitimate business interest in near-permanent customers: a nature-of-the-business test and a seven-factor test.  *Outsource Intern.*, 192 F.3d at 667.  The nature-of-the-business test defines certain industry traits that bear on the nature of customer relationships.  As the Seventh Circuit observed, "a near-permanent relationship is generally absent where the nature of the plaintiff's business does not engender customer loyalty by providing a unique product or personal service and customers utilize many suppliers simultaneously to meet their needs." *Id.* (quoting *Lawrence & Allen*, 292 Ill. App. 3d at 142, 685 N.E.2d at 444).  Thus, while "a near-permanent relationship with clients is inherent in the provision of professional services," businesses that engage in "ordinary sales" generally do not attract near-permanent customers.  *Outsource Intern.*, 192 F.3d at 667 (quoting *Lawrence & Allen*, 292 Ill. App. 3d at 142, 685 N.E.2d at 444).

If the court can readily classify a business as either "professional services" or "ordinary sales," the nature-of-the business test most appropriate.  When the industry lies somewhere in

between, the court will often need to look to the seven-factor test. *See Springfield Rare Coin*, 250 Ill. App. 3d at 937, 620 N.E.2d at 490. That test considers the following factors:

> (1) the length of time required to develop the clientele; (2) the amount of money invested to acquire clients; (3) the degree of difficulty in acquiring clients; (4) the extent of personal customer contact by the employee; (5) the extent of the employer's knowledge of its clients; (6) the duration of the customers' association with the employer; and (7) the continuity of employer-customer relationships.

*Abbott-Interfast Corp. v. Harkabus*, 250 Ill. App. 3d 13, 17, 619 N.E.2d 1337, 1341 (2d Dist.1993), quoting *LSBZ, Inc. v. Brokis*, 237 Ill. App. 3d 415, 426, 603 N.E.2d 1240, 1248 (2d Dist. 1992). In order to establish that it has near-permanent relationships, the employer usually must make a positive showing on most or all of these factors. *See, e.g.*, *Agrimerica, Inc. v. Mathes*, 170 Ill. App. 3d 1025, 1032-33, 524 N.E.2d 947, 951 (1st Dist. 1988); *McRand, Inc. v. van Beelen*, 138 Ill. App. 3d 1045, 1051-53, 486 N.E.2d 1306, 1311-12 (1st Dist.1985). For instance, in *Agrimerica*, the plaintiff company (1) required six months to a year from the time of first contact to make an initial sale, (2) spent $300,000 to $400,000 per year on research projects to attract customers, (3) utilized both ongoing solicitation and research projects to entice customers, (4) contacted key customers through the defendant employee at least once a month, (5) cooperatively developed research projects with customers, and (6) and (7) serviced some customers continuously for over thirty years. 170 Ill. App. 3d at 1032–33, 524 N.E.2d at 951-52.

Lanyap cannot claim a protectable interest in near-permanent customer relationships. Indeed, under the nature-of-the-business test, Illinois courts have observed that serious doubt exists whether any company in the printing industry can claim a legitimate business interest in near-permanent customers. *See Curtis 1000*, 24 F.3d at 948 *and cases cited therein*. In the alternative, even were the court to treat Lanyap as a provider of "professional advertising services" and turn to the seven-factor test,[13] Plaintiff's evidence does not support a finding of near-permanent customers.

---

[13] Considering Lanyap a provider of professional services is a stretch. A large part of the reason that professional services have near-permanent customers is that "the quality of the seller's service is difficult to determine by simple inspection," so that customers tend to develop trust
(continued...)

Plaintiff makes no showing nor argument about four of the seven factors: the length of time or amount of money required to acquire new clients, the extent of personal customer contact by Matthews,[14] or Lanyap's familiarity with its customers. (Pl.'s Resp. 11.) Plaintiff does argue that it had a high degree of difficulty in acquiring clients in that it "did not get many names of customers from trade shows," but it does not explain how it typically did attract customers or why that process was difficult. (*Id.*) Finally, none of the three customers at issue had a relationship with Lanyap that was both lengthy and continuous. Nationwide had been a customer since the late 1990's, but its business was not continuous, because it required Lanyap to bid competitively for any jobs performed. (Shaw Dep. 45, Ex. 4 to Bryan Decl.) Anchor may have been a continuous customer, in that it did not require Lanyap to compete over ongoing projects, but Lanyap had provided services Anchor for only two years. (Answer to Interrog. No. 14, Ex. 12 to Harrod Decl.) In most cases where Illinois courts recognize near-permanent customer relationships under the seven-factor test, the employer can show continuous relationships that have lasted much longer. *See, e.g.*, *Agrimerica*, 170 Ill. App. 3d at 1033, 524 N.E.2d at 952 (up to thirty years); *McRand*, 138 Ill. App. 3d at 1053, 486 N.E.2d at 1312 (up to nine years). Nor has Plaintiff produced evidence that its relationship with Centier was either continuous or long-lasting. Quite the opposite: Plaintiff included in its summary judgment materials testimony from a former Centier employee that the bank was not doing any business with Lanyap around the time that Matthews was fired. (Strickland Dep. 26-27, Ex. 11 to Harrod Decl.) Ultimately, none of the seven factors weigh strongly in Plaintiff's favor, and even assuming valid Plaintiff's arguments about the three factors it addresses, three of seven relevant factors are not enough. Thus Plaintiff cannot claim a legitimate business interest in

---

[13](...continued)
in one particular seller. *Curtis 1000*, 24 F.3d at 948. In contrast, "trust is attenuated" where the product consists of simple goods, the quality of which a buyer may easily determine. *Id.* Mail advertisements certainly seem to fall into the latter category.

[14]     It might seem that Matthews's status as Lanyap's "primary contact" with Nationwide and Anchor would weigh in favor of this factor, (Pl.'s 56.1 ¶ 26), but Plaintiff has not so argued, and the court declines to develop the argument on its own.

near-permanent customer relationships.

## 2. Reasonableness of the Covenant

Even if an employer can support its restrictive covenant with a legitimate business interest, the covenant must also contain reasonable terms. As the Illinois Supreme Court put it, "In determining whether a restraint is reasonable it is necessary to consider whether enforcement will be injurious to the public or cause undue hardship to the promissor, and whether the restraint imposed is greater than is necessary to protect the promisee." *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 76, 866 N.E.2d 85, 98-99 (2006) (quoting *House of Vision, Inc. v. Hiyane*, 37 Ill. 2d 32, 37, 225 N.E.2d 21, 24 (1967)). Thus, the reasonableness inquiry contains three prongs: hardship to the employee, injury to the public, and relation of the covenant's terms to the employer's sued for protection. *See Mohanty*, 225 Ill. 2d at 76, 866 N.E.2d at 98-99. Under these standards, as explained below, Defendant Matthews is entitled to summary judgment on her claim that the non-solicitation clause of the covenant is unenforceable.

### a. Hardship upon the Employee and Injury to the Public

On the question of the covenant's hardship upon the former employee, Plaintiff correctly points out that Illinois courts often consider what fraction of the customer pool is affected by a non-solicitation provision. Thus, Illinois courts have held that covenants did not impose an unreasonable burden on the employee where the covenants only restricted contact with thirty-five out of 200 or fifty to sixty out of 300 to 400 customers in a given customer pool. *See Agrimerica*, 170 Ill. App. 3d at 1033-34, 524 N.E.2d at 952; *Wessel Co. v. Busa*, 28 Ill. App. 3d 686, 691, 329 N.E.2d 414, 418 (1st Dist. 1975). Int his case, Lanyap's clients only totaled fifteen, a tiny fraction of the companies that might use direct marketing. (Pl.'s Additional ¶ 39.) Meanwhile, the non-disclosure clause merely prohibited Matthews from disclosing confidential information or retaining company documents. Defendants make no argument that either provision was overly harsh (Defs.' Mem. 8-10), and this court likewise cannot say that the covenant imposed an unreasonable burden

on Matthews.

Nor does enforcement of the covenant injure the public. In addressing that issue, Illinois courts consider the restrictions imposed in the public's access to the relevant goods or services.[15] *See Lawrence & Allen*, 292 Ill. App. 3d at 141, 685 N.E.2d at 443 (covenant not injurious to the public where "outplacement service industry is highly competitive and there are other outplacement firms to provide outplacement services"); *Agrimerica*, 170 Ill. App. 3d at 1034, 557 N.E.2d at 952 (no injury to the public where "competitive pricing in the industry" ensured that "other companies exist to fill the demand"). Both sides here agree that "there is a great deal of competition" in their industry. (Pl.'s 56.2 ¶ 64.) If that is the case, enforcement of this covenant would not injure the public. *See Agrimerica*, 170 Ill. App. 3d at 1034, 557 N.E.2d at 952.

### b.    Relation of Terms to Protecting the Employer

Next, the court considers "whether the restraint imposed is greater than is necessary to protect the promisee." *Mohanty*, 225 Ill. 2d at 76, 866 N.E.2d at 98-99. Activity restraints such as the non-solicitation and non-disclosure clauses here "do not require geographic limitations, but must be reasonably related to the employer's interest in protecting customer relations that its employees developed while working for the employer." *Arpac Corp. v. Murray*, 226 Ill. App. 3d 65, 76, 589 N.E.2d 640, 649 (1st Dist. 1992). Illinois courts will generally not enforce non-solicitation provisions that prohibit a former employee from soliciting customers other than those with whom the employee had direct contact while employed. *See Lawrence & Allen*, 292 Ill. App. 3d at 139, 685 N.E.2d at 441-42; *McRand*, 138 Ill. App. 3d at 1058, 486 N.E.2d at 1315.

The non-solicitation clause in this case on its face prohibits Matthews from soliciting customers with whom she had no prior personal contact, as well as companies that were former

---

[15]    Defendants argue that the covenant injures the public in that Lanyap is no longer a functional direct marketing company and that the covenant would prevent Print Solutions' customers from using their preferred direct marketing provider, but they cite no authority for these propositions and as Plaintiff seeks no injunctive relief, the court concludes these defenses are not relevant. (Defs.' Mem. 9-10.)

clients or mere prospects of Lanyap. (Employee Agreement.) Lanyap had no protectable interest in former or prospective customers, so its non-solicitation clause is overbroad.[16] *See Lawrence & Allen*, 292 Ill. App. 3d at 139, 685 N.E.2d at 441-42. In contrast, the non-disclosure provision merely prohibits Matthews from disclosing confidential information or retaining Lanyap's documents. Plaintiff has an interest in protecting confidential information, so a non-disclosure clause is not "greater than is necessary" to protect Lanyap. *Mohanty*, 225 Ill. 2d at 76, 866 N.E.2d at 98-99.

Like activity restrictions, the temporal limits in restrictive covenants must also bear some relation "to safeguarding the employer's protectable interest." *McRand*, 138 Ill. App. 3d at 1056, 486 N.E.2d at 1314. In other words, the time limit in a covenant generally must bear some relation to the time required to develop the protectable interest. *See, e.g.*, *Mohanty*, 225 Ill. 2d at 77-78, 866 N.E.2d at 99-100. For instance, the Illinois Supreme court upheld covenants of three and five years where evidence showed that a clinic required three to five years to develop a customer base. *Id.*; *see also Agrimerica*, 170 Ill. App. 3d at 1034, 524 N.E.2d at 953 (two-year restrictive covenant reasonable in light of evidence that business required two years to establish buyer-seller relationships).

Plaintiff Lanyap has produced evidence to support the reasonableness of the two-year non-disclosure clause: President Miller testified that the company's pricing methods, in particular the pricing software, was based on his and Vice President Shaw's years of experience in the direct

---

[16]     Plaintiff cites *Tower Oil* for the proposition that "[c]ovenants which restrict the solicitation of former clients are not *per se* unreasonable" (Pl.'s Mem. 12), but taken in context, *Tower Oil* was referring to customers with whom a defendant salesman had formerly worked, not customers who had abandoned the plaintiff company. *See* 99 Ill. App. 3d at 644, 425 N.E.2d at 1066. The touchstone of reasonableness in restrictive covenants is whether the terms of the covenant are reasonably necessary to protect some legitimate business interest of the employer. *See Lawrence & Allen*, 292 Ill. App. 3d at 138, 685 N.E.2d at 441.

      Moreover, even looking past the unreasonable terms in the non-solicitation clause, Lanyap's covenant did not need a non-solicitation provision in order to protect any legitimate business interest established here. Because the covenant has a non-disclosure clause to protect Lanyap's interest in confidential information, a non-solicitation provision was really only necessary if it were to protect relationships with near-permanent customers. As discussed above, Lanyap had no protectable interest in near-permanent customers, so the non-solicitation provision as a whole was not "necessary to protect the promisee." *Mohanty*, 225 Ill. 2d at 76, 866 N.E.2d at 98-99.

marketing industry. (Miller Dep. 192-93.) If that is true, the two-year non-disclosure provision bore a sufficient relationship to the interest it sought to protect. *Cf. Agrimerica*, 170 Ill. App. 3d at 1034, 524 N.E.2d at 953. In contrast, Plaintiff offered no evidence of how long it took to develop customer relationships or how long a typical relationship lasted. Furthermore, as discussed above, Lanyap had no near-permanent customers. As a result, the one-year non-solicitation provision did not bear any relation "to safeguarding the employer's protectable interest." *McRand*, 138 Ill. App. 3d at 1056, 486 N.E.2d at 1314.

Having held Lanyap's non-solicitation clause to be an overbroad activity restriction, the court must decide whether the covenant's reasonable portions can be enforced. Illinois courts will sometimes enforce an overbroad covenant up to the point it is reasonable, but not if partial enforcement would amount to redrafting the contract. *See Lee/O'Keefe Ins. Agency, Inc. v. Ferega*, 163 Ill. App. 3d 997, 1006-07, 516 N.E.2d 1313, 1319 (4th Dist.1987) (upholding the trial court's refusal to "draft[ ] a new contract," out of fear of discouraging the "narrow and precise draftsmanship" that restrictive covenants should reflect). Courts will be more likely to partially enforce an overbroad covenant if the covenant contains a severability clause or if the relevant provisions operate independently of each other. *See, e.g.*, *Abbott-Interfast*, 250 Ill. App. 3d at 21, 619 N.E.2d at 1343-44; *McRand*, 138 Ill. App. 3d at 1058, 486 N.E.2d at 1315-16. In addition, the fairness of the covenant as originally drafted is relevant to whether partial enforcement is appropriate. *Abbott-Interfast*, 250 Ill. App. 3d at 21, 619 N.E.2d at 1344 (partially enforcing a restrictive covenant, where "the equities" favored enforcing the valid provisions of the covenant).

The employee agreement in this case contains no severability clause, and Plaintiff makes no argument that any portions of the agreement are severable. (Pl.'s Resp. 11-13.) More importantly, defining an enforceable version of the non-solicitation clause itself would essentially mean rewriting the agreement, which this court declines to do. The court concludes that the entire non-solicitation portion of the employee agreement is unenforceable. *See Lee/O'Keefe*, 163 Ill.

App. 3d at 1006-07, 516 N.E.2d at 1319. The non-disclosure portion of the agreement stands on its own without the non-solicitation provision, however; the non-disclosure clause occupies a separate paragraph from the non-solicitation clause, and it makes sense even after striking the non-solicitation portion of the covenant. Furthermore, while the non-solicitation clause may have been overbroad, there was nothing particularly unfair about the non-disclosure provision. Accordingly, the court will allow that portion of the agreement to stand. *Cf. Abbott-Interfast*, 250 Ill. App. 3d at 21, 619 N.E.2d at 1343-44.

### C. Causation of Damages

Aside from the enforceability of the covenant, a lack of evidence concerning causation will prevent Plaintiff from collecting damages for loss of sales to Nationwide Insurance or Centier Bank. Although it is not labeled a causation argument, Defendants assert, "Plaintiff also cannot show that the customers which it claimed to 'own' would have kept their business with Lanyap even if Matthews had not acted." (Defs.' Mem. 10.) In other words, even if Matthews breached an enforceable agreement, Plaintiff still bears the burden to show that the breach resulted in damages. Under Illinois law, "the plaintiff must introduce evidence which establishes a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result." *Tower Oil*, 99 Ill. App. 3d at 646, 425 N.E.2d at 1068. The plaintiff in restrictive covenant cases bears a burden to produce evidence that establishes a "basis for the assessment of damages with a fair degree of probability." *Agrimerica, Inc. v. Mathes*, 199 Ill. App. 3d 435, 452, 557 N.E.2d 357, 369 (1st Dist. 1990) *abrogated on other grounds by Roy v. Coyne*, 259 Ill. App. 3d 269, 630 N.E.2d 1024 (1st Dist. 1994). In *Tower Oil*, for example, the causation test was satisfied where the plaintiff showed that five "stable customers" switched their business to the competitor for which a defendant salesman had gone to work. 99 Ill. App. 3d at 646-47, 425 N.E.2d at 1068.

Plaintiff has not produced evidence sufficient to support a finding that Matthews's breach

of the restrictive covenant caused Lanyap to lose business from Nationwide or Centier. Concerning Nationwide, Plaintiff admitted that the insurance company left as the result of a drop in quality of service, months before it decided to begin doing business with Print Solutions. (Pl.'s 56.1 ¶ 39.) In other words, Nationwide was not Lanyap's "stable customer," but rather one that might have ceased placing orders with Lanyap even if Matthews had not bid for its business. *Tower Oil*, 99 Ill. App. 3d at 646, 425 N.E.2d at 1068.

Plaintiff has likewise failed to produce evidence to show that Matthews deprived Lanyap of Centier's business. To do so, Plaintiff needed to show "with a fair degree of probability" that Lanyap would have done business with Centier in the future, but for Matthews's conduct. *Agrimerica*, 199 Ill. App. 3d at 452, 557 N.E.2d at 369. In fact, Plaintiff only showed a small amount of past business with the bank, producing no evidence that it had an active relationship or reason to expect future business with Centier at the time Matthews left Lanyap. (Pl.'s 56.1 ¶ 26.) A former Centier employee testified that the bank was not doing any business with Lanyap at the time Matthews left (Strickland Dep. 26-27, Ex. 11 to Harrod Decl.), and Plaintiff has offered no evidence that it had reason to expect future business with Centier. Furthermore, the Centier employee testified that the orders Print Solutions filled for the bank were stationary projects as opposed to the direct marketing work Lanyap did, and that Centier used completely different companies for these two different types of printing projects. (*Id.* at 29-30.) Because Plaintiff fails to produce evidence that Matthews's breach caused Lanyap to lose business from Nationwide or Centier, it cannot collect damages for loss of those companies' business.

### D.    Waiver of Tortious Interference and Trade Secrets Claims

The tortious interference and trade secrets counts are waived, because Plaintiff has cited no authority to support its claims. Where an argument is "underdeveloped and unsupported by law," it will be waived. *Outsource Intern.*, 192 F.3d at 699 (holding waived the defendant's argument against the reasonableness of a restrictive covenant). As the Seventh Circuit put it, "We

have repeatedly made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived . . . ." *Weinstein v. Schwartz*, 422 F.3d 476, 477 n.1 (7th Cir. 2005) (quoting *Kramer v. Banc of Am. Sec., LLC*, 355 F.3d 961, 964 n.1 (7th Cir. 2004)). In *Weinstein*, the plaintiff's conflict of interest argument cited a relevant professional rule but failed to provide any supporting case law. *See* Br. and Required Short App. of Pls.-Appellants at 26, 422 F.3d 476 (No. 04-2936). Likewise, a plaintiff waives its claim where it fails to contest a motion for summary judgment with arguments developed by relevant authority. *See, e.g.*, *Independent Trust Corp. v. Fidelity Nat. Title Ins. Co. of New York*, 577 F. Supp. 2d 1023, 1040 (N.D. Ill. 2008). Here, Plaintiff's tortious interference and trade secrets claims appear as no more than an afterthought; Plaintiff's memorandum in opposition of summary judgment squeezes all three claims into barely more than a page and includes not one citation to authority. (Pl.'s Resp. 14-15.) These "undeveloped arguments" amount to a waiver of Plaintiff's opposition to Defendants' motion for summary judgment. *Weinstein*, 422 F.3d at 477 n.1. Accordingly, this court grants summary judgment against Plaintiff on the counts of tortious interference with business expectancy, tortious interference with contract, and misappropriation of trade secrets.

## CONCLUSION

Defendants' motion for summary judgment [59] is granted in part and denied in part. Summary judgment on the breach of contract count is denied, but only insofar as Plaintiff seeks damages for Matthews's use of confidential pricing information to solicit business from Anchor Bank. (Am. Compl. Count I.) Plaintiff has waived its claims of tortious interference with business expectancy, tortious interference with contract, and misappropriation of trade secrets, so the court enters judgment in favor of Defendants on Counts II, IV, and V of the Amended Complaint. Defendant Print Solutions, Inc. is accordingly dismissed from this action.

A status conference is set for Tuesday, April 14, 2009, at 9:00 a.m. The parties are encouraged to discuss a settlement.

ENTER:

Dated: March 24, 2009

_____
REBECCA R. PALLMEYER
United States District Judge